**Affirm and Opinion Filed March 19, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-01334-CV

## IN THE INTEREST OF J.M.G.G., A CHILD

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-18-00579-X**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Molberg

In this suit affecting the parent-child relationship, a jury found that the parental rights of J.M.G.G.'s mother (Mother) and father (Father or J.G.G.) should be terminated and that the Texas Department of Family and Protective Services (Department) should be named permanent managing conservator of J.M.G.G., instead of Father's mother (Grandmother). The trial court rendered judgment according to the jury's verdict.[1] Father appeals the trial court's judgment and decree appointing the Department as J.M.G.G.'s managing conservator. Mother appeals

---

[1] *See* TEX. FAM. CODE § 105.002(c) (trial court may not contravene jury verdict on issue of appointment of managing conservator).

the trial court's judgment and decree terminating the parent-child relationship between her and J.M.G.G.

## BACKGROUND[2]

J.M.G.G. was born on November 29, 2017, with a respiratory illness that requires substantial daily care, treatments, and monitoring. When J.M.G.G. was five months old, Mother left him with Grandmother the day after he had been discharged from the hospital after being admitted for congestion and fever. Two days later, Grandmother took J.M.G.G. to the hospital again when he began having trouble breathing. Doctors diagnosed J.M.G.G. with two viruses, including rhinovirus, and a partially collapsed lung, and he was admitted into the intensive care unit. Mother was informed of J.M.G.G.'s condition, but she did not go to the hospital for five days. With Mother's authorization, the hospital subsequently released J.M.G.G. to Grandmother.

A month after J.M.G.G. was born, Mother was seventeen years old, homeless, and under court order to reside at Promise House, which provides assistance to "pregnant and teenage mothers with services like counseling, education, [and] parenting skills." Mother left Promise House three times. Mother has a history of substance abuse, including use of marijuana and possibly cocaine.[3] At trial, a

---

[2] Because this Court does not have subject matter jurisdiction over Father's appeal, we discuss the facts as they relate to Mother's appeal.

[3] At trial, Mother denied using cocaine, but a Department investigator testified Mother admitted to him that she used cocaine and marijuana.

Department investigator testified Mother "would continuously leave [J.M.G.G.] in [Grandmother's] care, knowing that [J.M.G.G.] was born with a respiratory issue" that required care and monitoring "basically 24/7." The Department eventually placed J.M.G.G. into foster care.

Mother was incarcerated for the offense of robbery from approximately May 20 through late July of 2019. Rachel Stankus, a conservator worker at Child Protective Services (CPS), testified that after Mother was released from jail, she was forty-five minutes late for her first scheduled visit with J.M.G.G. and she was not able to see him. Mother canceled the second scheduled visit. Mother showed up on time for the third scheduled visit, but only interacted with him for approximately thirty minutes of the two hours allotted to her. Stankus testified J.M.G.G. did not recognize Mother at that visit, he did not "call her any name or refer to her as anything," and he did not appear "bonded to her." According to Stankus, the Department ultimately requested termination of Mother's parental rights because she engaged in "conduct endangering the physical and emotional well-being of [J.M.G.G.]," including "leaving [him] alone and not returning for days at a time, as well as her being arrested" for robbery.[4] Stankus testified J.M.G.G. was "doing very well at his current placement. He's bonded to his caregivers and has had no major

---

[4] Mother subsequently was convicted of robbery.

concerns while being placed there." If he returned to the care of Mother, Stankus believed "he would suffer physical neglect or emotional harm."

At trial, Mother admitted she missed multiple opportunities to visit J.M.G.G., and she testified she did not remember how many times she visited J.M.G.G. after CPS removed him from her care in May of 2018. Mother testified she did not know what medication J.M.G.G. is taking, what kind of therapy he needs, how many times a week he has therapy, or who his doctors are. She agreed no one "has denied [her] information or hidden what was wrong with [J.M.G.G.], what he needed, and what the next steps would be."

J.M.G.G.'s foster mother testified to his extensive medical needs, including respiratory treatments and administration of medication through a feeding tube twice daily. J.M.G.G. also receives feeding therapy two to three times a week to help him "learn how to feed himself and to be able to chew and swallow properly." Feeding therapy involves placing a machine "on his neck that helps trigger his muscles [to] know how to swallow properly to try to help with the aspiration. And [therapists] also are working with him [to learn] to speak because he is delayed in his speaking ability." J.M.G.G. "also works with early childhood intervention [for] occupation therapy [such as] how to put his arms through his shirt when you are trying to put it on and how to take his socks and shoes on and off and all those skills you would expect an almost two year old to have." Foster mother testified J.M.G.G. was her first foster child. When J.M.G.G. initially was placed in her care, she understood

the placement was "not necessarily long term" and she was "there to provide a safe and loving home for him while he needed it." During that period, foster mother was "rooting for the mother" and "offered assistance to her" by inviting her to the hospital when J.M.G.G. was having surgery, providing updates on his condition, and notifying her of medical emergencies. Foster mother communicated with Mother through CPS. To that end, foster mother gave Mother a cell phone[5] "and charged it up with minutes" so that "[Mother] could be in contact with CPS. [The birthday] card said, [this cell phone] is so that CPS can contact you when [J.M.G.G.] is in the hospital so that you can be there." Foster mother believed Mother "did not take advantage of that gift." Foster mother was "never able to contact [Mother] through CPS using that phone." Mother testified she never used the cell phone and she did not know what happened to it.

On May 17, 2018, the Department filed a petition seeking to terminate Mother's and Father's parental rights. On June 29, 2018, Grandmother filed an intervention seeking to be appointed J.M.G.G.'s managing conservator. After a jury trial, the jury found that, in the child's best interest, Mother's and Father's parental rights should be terminated and CPS should be appointed managing conservator. The trial court accepted the jury verdict and signed a judgment and decree

---

[5] Foster mother purchased the cell phone as a birthday gift from J.M.G.G. to Mother.

terminating Mother's and Father's parental rights and naming the Department as J.M.G.G.'s managing conservator. This appeal followed.

## FATHER'S APPEAL

Father does not appeal the termination of his parental rights. He only appeals "the jury's decision finding that the [Department] should [be J.M.G.G.'s permanent managing conservator]," and not Grandmother. We conclude Father lacks standing to challenge the jury's findings and the trial court's judgment and decree regarding conservatorship.

An order terminating a parent's rights to a child divests the parent and the child of all legal rights and duties with respect to each other except the child's right to inherit from and through the parent. TEX. FAM. CODE § 161.206(b). Because Father does not appeal the jury's determination that his parental rights should be terminated, those findings are binding on him. *In re A.N.A., A.Y.A., and A.I.A*, No. 05-18-00169-CV, 2018 WL 2228624, at *1–2 (Tex. App.—Dallas May 16, 2018, no pet.) (mem. op.); *In re S.M.C.*, No. 07-04-0429-CV, 2005 WL 441538, at *1 (Tex. App.—Amarillo Feb. 25, 2005, no pet.) (mem. op.). Upon termination of the parent-child relationship between Father and J.M.G.G., Father lost all legal rights with respect to J.M.G.G. As a result, Father does not have standing to challenge the jury's findings concerning appointment of the Department as J.M.G.G.'s managing conservator. *In re E.M.*, No. 05-18-01161-CV, 2019 WL 1449791, at *9 (Tex. App.—Dallas April 1, 2019, no pet.) (mem. op.); *In re A.N.A.*, 2018 WL 2228624,

–6–

at *1. Therefore, we do not have subject matter jurisdiction over his claim. Accordingly, we dismiss Father's appeal.

## MOTHER'S APPEAL

Mother appeals the trial court's termination of her parental rights to J.M.G.G. On November 12 and 14, 2019, Mother filed a notice of appeal "from all portions of the judgment" in the trial court and in this Court, respectively. On or about January 27, 2020, Mother's appointed appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1966), stating she diligently reviewed the record and concluded Mother's appeal is wholly without merit and frivolous. Counsel provided Mother a copy of the *Anders* brief and advised Mother of her right to examine the appellate record and file a pro se response. This Court also provided Mother a copy of the *Anders* brief and notified her of her right to examine the appellate record and file a pro se response. Mother did not file a pro se response.

The procedures established in *Anders v. California*, 386 U.S. 738, apply to an appeal from a trial court's judgment terminating parental rights where, as here, appellant's appointed counsel concludes there are no non-frivolous issues to assert on appeal. *See In re D.D.*, 279 S.W.3d 849, 849–50 (Tex. App.—Dallas 2009, pet. denied). This Court is not required to address the merits of each claim raised in an *Anders* brief or in a pro se response. *See id.* at 850. Instead, we are obliged to determine whether any arguable grounds for reversal exist and, if so, to remand the

case to the trial court so that new counsel may be appointed to address the issues. *Id.*

In her *Anders* brief, Mother's appellate counsel explains why, in her professional opinion after diligently reviewing the record and the applicable law, there are no arguable grounds for reversal and Mother's appeal is frivolous and without merit. *See Anders*, 386 U.S. at 744. After reviewing the record, we found nothing that arguably could support Mother's appeal, and we conclude the appeal is frivolous and without merit. Accordingly, we affirm the trial court's judgment and decree terminating Mother's parental rights.

Having dismissed Father's appeal and having resolved Mother's appeal against her, we affirm the trial court's judgment.

/Ken Molberg//

KEN MOLBERG
JUSTICE

191334f.p05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF J.M.G.G., A CHILD

No. 05-19-01334-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JC-18-00579-X.

Opinion delivered by Justice Molberg. Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, we **DISMISS** J.G.G.'s appeal for lack of subject matter jurisdiction, and the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 19th day of March 2020.